Well, thank you, Your Honor. Your Honors, good morning. Reynold Finnegan, on behalf of Ms. Dunya Tupikovskaya, who is present in court today in the second row. This is an asylum case from Uzbekistan centered around the issue of credibility. Counsel, let me clarify something for the record. The government has sent a 28J letter calling our attention to the Shrestha case. And I wanted to confirm whether you agreed or disagreed that this is a post-Real ID Act hearing. I disagree, Your Honor. That was just about to be the point I was going to make. This is definitely a pre-Real ID Act case. I even telephoned government counsel after the 28J letter to say my opinion is this case is entirely inapplicable to the issues at bar because it is a post-Real ID conclusion. And our case definitely began before May 11, 2005, which is when the Real ID Act was enacted. The meritorian was actually held in 2004 in front of the IJ. And if my – our opinion, our position is that if under the case law and the laws that exist pre-Real ID Act case, there is no way that the adverse credibility holding can be upheld, there's no support for it in the grounds every instance relied upon by the IJ and thereafter. The BIA is either minor in nature, not material to the asylum claim, or it's based upon speculation of the immigration judge, or it's been adequately explained by respondent, I mean by the petitioner who's called the respondent in court, immigration court. Even if that explanation was not ultimately accepted by the IJ, it was explained. So of the 12 reasons that were given by the IJ, if we were to find that even one of those that goes to the heart of the claim is supported by substantial evidence, wouldn't we have to deny the petition? I know you don't agree with the premise, but I'm asking the theory. Yes. I would think that if one of them is material and goes to the heart of the claim and was not adequately explained, then that would maybe support it quite probably. And that's the Wang case, and others have said that, I think. Right, Your Honor. Okay. Right. Right. But if you look at the holdings of Wang. When was that letter sent by the Justice Department? January 26th, I believe. When? January 26th. I haven't seen it. It should be Monday or Tuesday. If you look at the holdings of Wang, they break it down into four holdings on the Westlaw, and two of them they find are not adequate grounds to support an adverse credibility, where two of the reasons they find in Wang do support the adverse credibility. I would submit to this Court that the two that would support it don't exist in our case, which is, you know, there's no inconsistencies between Petitioner Ms. Galina Tupovskaya's testimony and either her I-589 written application or discrepancies between her testimony and documentary evidence which was present in the Wang case. If you look at her son's testimony, her son testified as a witness. He was unclear about certain things about his stepfather's membership in the opposition group called Berlig. He only lived with his mother and stepfather for seven months. It's quite understandable if he doesn't know exact details. You know, things were adequately explained, the perceived discrepancies. That I saw. We've addressed every one of them, I think, in the BIA and the Ninth Circuit appeals briefs, in the briefs, Your Honors. And, you know, her prior employment, she explains how they have a ghost employee system in Uzbekistan and other countries where you're on the payroll, but you're technically not working for the company any longer, but you're still listed as an employee. You're still drawing a paycheck. That's not a discrepancy. That's just ‑‑ Was it a common practice to have people, in quotes, on the books? It seems like it was, Your Honor. I don't have any independent support for that, but it seems like in former communist countries it's very common, you know, people reach the pension age and so on, that they remain on the books. They still draw a salary, but they're not working for the company. I don't know. Is there ‑‑ I would ask Justice Graber, is there anything you saw in those 12 explanations that ‑‑ I'm not here to answer the questions. Okay. I'm sorry. Because I personally, I didn't see any. That's why I'm asking if Your Honors see anything. In my mind, everything was not material to Ms. Tugovskaya's asylum claim. Granted, her husband was a member of Berlik, and there were some discrepancies about his membership, but that's not related to her claim per se. Well, one potential discrepancy is that the son testified to one arrest while she testified to two arrests, and the arrests would appear to go to the heart of the claim. There was also a demeanor finding about absence of emotion and sort of certain manifestations of that. And those are two that perhaps you could respond to. Yes, Your Honor. Thank you. As far as the son ‑‑ the two arrests, one was in Uzbekistan, one was in Russia. After responding, it was kind of ‑‑ And the son testified that she was not arrested in Russia but only in Uzbekistan. Right. He didn't have clarity as to the arrest in Russia. Well, he said it didn't happen. That's different. I mean, you're saying it's not clarity because it doesn't match what your client said. But why isn't that a discrepancy? Well, I guess it would be a discrepancy. But I think the son, maybe he didn't have knowledge of the arrest in Russia. He was not with his mother in Russia when it happened. According to Ms. Trubovskaya's testimony, her husband was extradited back to Uzbekistan where she was not. She kind of went back on her own, and there was a little confusion about that. And I think the son had already traveled to the United States at that point. His wife had gotten asylum through the consulate, and he went to ‑‑ he was already in the United States. So he ‑‑ during his testimony, he didn't have the information or the knowledge. So in my mind, it wouldn't really be a discrepancy if he doesn't have the knowledge about how his mother was arrested in Russia. Well, that's an explanation. Was that explanation provided to the immigration? Yeah, if you look at page 33 and page 34 of my opening brief, Your Honor, I touched on it there where the son testifies. The question was posed about an arrest. It doesn't say which arrest. So if you look at the cross-examination, it says we talk about your mother's arrest. When was she arrested? And I don't know if it exactly says how many times. I'd have to look at it again. But I don't think it was. If you look at ‑‑ What is your response about the demeanor finding? Okay. What weight should we give to that? Yes, Your Honor. In demeanor, this I.J. seemed to be biased, although he might not have enough to support a biased holding. There is definitely an issue where he seems to be biased against the respondents, I mean, the asylum seeker. In this case, for example, Ms. Kubitskaya listed she was Jewish on her I-589. That was not even part of the case, yet the I.J. jumps on that to say, you know, she listed Jewish, but she doesn't show any support for it. Well, because she wasn't presenting that as a reason for her asylum case. I think it enhances her credibility that she lists she's Jewish but doesn't use it to, you know, to enhance her asylum case. It did show in her passport she applied for a visa. Israel was denied, so that's where she had her Jewish claim. But things like that, the way the I.J. refused to accept her explanation, I think it has a bias. Then if you look at page 34 and 35 of the brief, of opening brief, it says the I.J. should not be entitled to deference on a demeanor decision pursuant to the Jibril case and the Arum-Palem case if there is some sort of bias in his actions, if the I.J. is not given an adequate opportunity to respond, his demeanor should not be given a deference. And that's page 34 and 35 of my opening brief here. And I'd like to reserve a minute for another comment. Thank you. May it please the Court. Andrea Givis on behalf of the Attorney General. This Court should deny Petitioner's petition for review because she's ineligible for both asylum and withholding of removal. Substantial evidence supports the agency's finding that she is not credible, and it is her burden to demonstrate that she is eligible. First, that the ---- Would you respond to my question about your 28-day letter? Of course. What is the reason for citing ---- I can't pronounce it. I feel like I'm lipping, but it's Shrestha. But isn't this a pre-May 11, 2005 application? No question, Your Honor. And I apologize if I did not make it clear in my 28-day. I'm using it just for the limited scope of the cooperation portion. But that's a change in the law that applies only to post-May 11, 2005 applications. Actually, there is one part of the Post-Real ID Act that does apply to pre-Real ID Act cases. And the Real ID Act, if you look under 101H3, says the amendment made by Section E, and Section E is the standard of review which says no court shall reverse a determination made by a trier fact with respect to the availability of cooperating evidence unless the court finds that a reasonable trier fact is compelled to conclude that such cooperating evidence is unavailable. And that 101H3 says that that portion of the Real ID Act should take effect, should apply to all cases which the final administrative removal order is or was issued before, on, or after such date. And I'm just using it, using that case for that portion to go to the lack of cooperation and the standard of review that this Court must follow regarding such. But pre, you didn't need corroboration if you were credible. So it kind of turns on that. Isn't that correct? Correct. And in this case, the immigration judge did not find the petitioner credible. So the lack of cooperation does come into play. But what if we find that she was credible? If you would find that even though all of these inconsistencies and discrepancies, the immigration judge's demeanor finding as well as lack of cooperation. That demeanor finding I find very troubling. She or he did it on the basis that she showed no emotion when talking about her husband who had been jailed. Well, if I were up against that situation, I would try to sit there like a sphinx. Well, I think it went beyond more just her, I think the immigration judge said lack of emotion. Petitioner spoke of how she was afraid of her husband's safety in the asylum application. Spoke about how she did not want to leave Uzbekistan until after her husband's situation. So the immigration judge points out just that she's done nothing to investigate her husband's whereabouts. But if we're looking at demeanor, that has nothing to do with demeanor. He made a finding that she showed no emotion. Correct. So I don't think we go beyond that for the demeanor finding. And we weren't, none of us, at least I was not present at the courtroom at that time, so I'm not sure how petitioner answered the other 25 questions if she showed emotion and then when it came to this particular point, it was a, you know, a vast change. Therefore, the immigration judge was in the best position to assess the demeanor of respondent. And he does, the immigration judge does spend time in explaining his demeanor finding. It wasn't a one-sentence answer regarding her demeanor. He does spend a paragraph or more so speaking of her indifference and her lack of emotion in rendering his demeanor finding. Well, you know, different people react differently. I can't tell what's going through your head right now. No, Your Honor, but I think in assessing the whole courtroom proceeding, the immigration judge focused. Except that you sent this letter in. I never got it. I apologize for that, Your Honor. There is a presumption of something there. And then did you explain in that letter the limited purpose for which the case was cited? I focused on that limited purpose. I should maybe have used the word limited scope more so in that to specify that I'm not sure. Well, that's kind of deceptive. I mean, you're admitting that. I focused on the part. I did state the part I wanted to discuss regarding this. It's just by a case, and I apologize for my mispronunciation. But I was not in the courtroom. And the immigration judge, as this Court has said in numerous cases, is in the best position to observe the witness and is uniquely qualified to decide whether Petitioner's testimony has the ring of truth. Well, it has to go to the heart of her claim, too. And that is part of the heart of her claim, Your Honor. Her husband was the reason she fears returning. She spoke about her husband's situation as the reason she fears returning, which is the heart of her asylum claim. Well, there's no doubt he's in prison for political reasons. There is a question as to that. We have no document. There's no conviction documents. Petitioner's admitted she's unaware of his situation. She heard from others of his prison term and that he was in prison. But there is no ---- How do you get information out of Uzbekistan? I mean, you just ---- An affidavit from ---- You write them a letter and they answer it. This is ---- Whatever you want. Your Honor, she could have gotten an affidavit, a conviction document. How do you go get a conviction document? In Uzbekistan. I'm unaware. Maybe calling up the court. But there's other things besides that that she did not cooperate with. That's through the State Department. I'm unaware of how you get a conviction document. Lawyers even have trouble here getting certified copies of judgments of conviction. We've got a couple ---- There were several people that she said informed her of his situation and that he was in prison, an affidavit from any of those individuals. And going off of that, Your Honor, it's more ---- Maybe she didn't ask for that because she might put them at risk. You know, they read the mail that goes through. That kind of goes to my next point, Your Honor, about how other things that she did not provide. The only cooperating evidence she provided was her son's testimony as a cooperating witness, and that is riddled with inconsistencies. She provided ---- she worked on a health report that she says was given to the United Nations and published abroad in England. There's no ---- that none of that information was provided. The report was never provided. She provided no affidavits from anyone. Did she ask for it? This is her burden, Your Honor. She's trying to prove that she is eligible for asylum. But, counsel, something like a statement of a health report that she has done and submitted, it would seem that that stands unrebutted. I would not think I had to go farther than that. And the fact that her husband is in prison, I find it odd that the government really challenges that. You're suggesting he's not in prison? The immigration judge questioned that, yes, Your Honor. And there's more than just her failure to cooperate and her demeanor. Her son, as I said, was her cooperating witness. There was an inconsistency as to her arrest. She ---- And he said that he didn't really know much about the situation because he hadn't been around. Well, when she ---- He admits that in his testimony. Is that not true? He says that he was in America when he ---- He entered America in August 1998, and he said that after he entered America, his mother informed him of the situation. However, he said they were very close. And he, as her cooperating witness, stated that she was arrested because of a radio program in Moscow, was unaware of, said she was arrested in Uzbekistan, which is not what petitioner testified to. She said she was arrested in Uzbekistan in 1998 because of the research study. And more so, the son lived with the stepfather and the mother for a period of time, and he said that the father, who was active in Berlik at the time, was not concealing his activities. However, he had no knowledge about any of the activities. He claims that he was very close with his mother, has no knowledge of her membership, and considering his ex-wife or wife was a member of Berlik, she could have provided an affidavit from her talking about the Berlik activities in Uzbekistan. And then it's more than just her son's ---- There's more inconsistencies than just her son and her testimony. I'd like to sum up, so I'm just going to quickly go over them. The immigration judge noted the testimony in the asylum application that petitioner stated she was an engineer in her asylum application. When she testified, she said she was on the books. When asked specific what? On the books, as a ghost employee, is what she claimed. However, when asked what she did at home because she was not physically working as an engineer, she said she was staying at home, busy with assignments from Berlik. However, she had not started her membership in the Berlik movement until May 1997. And when asked again for clarification from the judge, she said that she raised her son. So she flip-flopped her story a few times as to what she was actually doing. And just to focus on this bias point, first of all, the government would argue that the petitioner has not exhausted her claim as to bias. And if this court would find that she had exhausted her claim, the judge went above and beyond. He provided... That issue was brought up, and I think counsel conceded that that was not a big deal, the issue of bias, not really relying on it. Right. Yes, he did concede that in his argument. So in sum, the immigration judge's decision should be upheld because of the numerous inconsistencies throughout the application, the failure to corroborate, and the demeanor. And as the Wayne case said, as long as one identified ground is supported by substantial evidence and goes to the heart of the claim, this court must uphold I.J.'s finding. And I'll take any other questions. What is that one? Well, I... The government would contest there are many. The inconsistencies probably would be the strongest point between her testimony and her son as he was her corroborating witness as opposed to support her claim and it actually undermined her claim. There's also inconsistencies between the testimony and her asylum application. When asked to... You know, a lot of times children, you know, they pick up information here and there and it can be misinterpreted, misunderstood. Parents don't tell the kids everything. I don't know why that's such a big deal. Then her testimony and her asylum application, there are two major inconsistencies that the immigration judge pointed to there. What are those? The occupation aspect, how the petitioner says on her asylum application she was an engineer from June 1990 to June 1999. However, during her testimony she says that she was on the books as this ghost employee. When further questioned, she flip-flopped between her Berlick membership and her staying at home to raise her son. And then when the immigration... That all could have happened, didn't it? Well, she was... They have ghost employees because I guess that's the way this factory or wherever she worked got more money from the government. Then why did she list on her asylum application that she... Wow. Then why did she list on her asylum application that she was an engineer from June 1990 to June 1999 and even... Well, how do we know she wasn't an engineer? Because she then testifies that she wasn't an engineer,  and they had her on the books as an engineer. Maybe whatever work she did was classified as engineering. A lot of it is labeling. I mean, it just seems to me that this poor woman and her husband who served eight years in one of those prisons have a terrible life, and they've been living in these totalitarian countries, and information is hard to get, and people are watched and all that. Have you ever been to Uzbekistan? I have not. Neither have I. And if I could just point one more thing. She also, for her reason for stating that she was coming to the U.S. when she went to the U.S. Embassy to get her visa, she stated that she wanted to see her son badly, states nothing about her political opinion, does not file for asylum, or mention her political opinion or any of the U.S. You go into some of those embassies and say you want to come to the U.S., and they start yelling at you. I've been in those embassies where people have asked for visas, and my daughter was about 12 years old. I went in there because instead of bringing her passport, I brought my son, so I had to get another passport. And here she was, 12 years old, and this embassy person is yelling at this old woman, and Katie, to her credit, went in there and told the guy that he had very bad manners and that he had to be nice to people. And this woman was crying, too. You don't get the best treatment in the world when you get out of an embassy. How people enter the country, we don't consider that one way or another as to their credibility from the case law. So anyway, you're way over your time. Okay. Thank you, Your Honors. Good morning again, Your Honors. Yeah, I'd like to just point out a couple quick things. If you look at the Guao case, G-U-O, documents are only required if they're easily available. In this case, they're not easily available. Also, if Your Honors look at the holding of the case. I think you testified, too, that it was published in England. Yeah. Why would that be not available? I understand why things are hard to get from Uzbekistan, but England is pretty responsive. Right. I believe the issue with that report, Your Honor, was Respondent was not quite positive as to where it was published, which publication, which country. First, she said Europe, and she said, I believe it was in England. And the problem was, we really – she just, in her mind, knew it had been published somewhere. She knew there was repercussions, but she couldn't pinpoint exactly where. And that's why it was not easily obtainable, because we couldn't locate it based upon her limited knowledge of where it was published. Also, Your Honors, I'd just point out, if you look at the Wang case, the first holding on the header says, you know, if it's a minor thing on a date or a minor thing, it's not support – it does not support adverse credibility pre-real ID act. And I believe the same applies here, where dates, the minor things, whether the son knew about his stepfather. We got your order. And that's it. I submit to the Court. Thank you very much. Thank you. The matter stands submitted.
judges: Fletcher B. , Pregerson, Graber